UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ANTHONY NITSO, | CASE NO. 4:22-CV-0328-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Anthony Nitso filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On March 1, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry dated March 1, 2022). Subsequently, all parties consented to my exercising jurisdiction over this matter pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure (ECF #8), and on June 8, 2022, this matter was reassigned to me for disposition (non-document entry dated June 8, 2022). Following review, and for the reasons stated below, I **REVERSE** the Commissioner's decision denying DIB and SSI and **REMAND** this matter to the Commissioner for further proceedings consistent with this opinion.

1

## PROCEDURAL BACKGROUND

Mr. Nitso filed for DIB and SSI on May 7, 2020, alleging a disability onset date of October 17, 2019. (Tr. 191-203). His claims were denied initially and on reconsideration. (Tr. 78-94, 95-110). He then requested a hearing before an Administrative Law Judge. (Tr. 111-14). Mr. Nitso, represented by counsel, and a vocational expert (VE) testified before the ALJ on December 18, 2020. (Tr. 29-78). On March 4, 2021, the ALJ issued a written decision finding Mr. Nitso not disabled. (Tr. 12-28). The Appeals Council denied Mr. Nitso's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Nitso timely filed this action on January 28, 2022. (ECF #1).

## FACTUAL BACKGROUND

### I.  PERSONAL AND VOCATIONAL EVIDENCE

Mr. Nitso was 31 years old at the time of his alleged onset date, and 32 years old at the time of the administrative hearing. (Tr. 197). He completed his GED in 2018. (Tr. 169). In the past, Mr. Nitso has been employed as a production assembler and conveyer feeder. (Tr. 43-45).

### II.  RELEVANT MEDICAL EVIDENCE

On October 15, 2019, Mr. Nitso went to the ER via ambulance, reporting he had a seizure[1] while working at a steel mill and lost consciousness. (Tr. 512). Dr. Lara Jehi reported a history of

---

[1]      Mr. Nitso experiences two types of seizures: generalized tonic-clonic seizures (otherwise known as grand mal seizures) and absence seizures (otherwise known as petit mal seizures). The medical records and testimony refer to generalized tonic-clonic seizures interchangeably with the term "grand mal" and absence seizures interchangeably with "petit mal." For consistency's sake, I will do the same here. There is no substantive difference between my reference to a generalized tonic-clonic seizure and my reference to a grand mal seizure, for example.

focal epilepsy categorized as tonic with a déjà vu aura occurring once every two to three months. (Tr. 309). Recent history included one seizure at the end of September 2019, one on October 15, 2019, and two on October 17, 2019. (*Id.*). During admission, he was observed to have one atypical event and one seizure. (*Id.*). Mr. Nitso reported having no known triggers and asked for a medication adjustment. (*Id.*). Dr. Jehi continued his antiepileptic drugs (AEDs), educated Mr. Nitso on seizure and fall precautions, provided him with a letter to return to work with the seizure precautions, and instructed him to follow up after discharge. (*Id.*).

On November 8, 2019, Mr. Nitso followed up as instructed with Dr. Jehi. He reported continuing to have seizures several times per week. (Tr. 313). Dr. Jehi noted he was more alert and interactive than his initial admission and he was tolerating his AEDs. (*Id.*). A neurological exam revealed a left eye hemorrhage present from a seizure. (Tr. 313). Dr. Jehi increased one of Mr. Nitso's AEDs because his seizures had not slowed in frequency, and Mr. Nitso reported having at least 20 since his October discharge. (*Id.*). Mr. Nitso's seizures were characterized as having an aura of intense déjà vu, tingles, raised goose bumps, and sitting with a blank stare. (Tr. 312). The seizures themselves involved a stiffening up, having his tongue clenched between his teeth, hands and feet clenched, and eyes rolled up into his head. (Tr. 315). The seizure stops and he then falls asleep for 10 to 15 minutes before he can talk. (*Id.*). Mr. Nitso was encouraged to call in one to two weeks and report his seizure frequencies to determine whether his medications should be adjusted. (*Id.*). He was also encouraged to follow up in four months with Dr. Jehi. (*Id.*).

On May 4, 2020, Mr. Nitso went to the ER after having a seizure and falling in the shower the previous night. (Tr. 457). To his knowledge, he did not hit his head and denied any headache or neck pain, but when he woke up the day after the fall, he experienced severe pain across his

lower back bilaterally and had such difficulty ambulating on his own that he contacted EMS to transport him to the hospital. (*Id.*). He was observed with abrasions on his upper back. (*Id.*). Examination noted paraspinal tenderness in the lumbosacral region with no fractures or subluxations. (Tr. 458). He was discharged with a prescription for pain medication, and was encouraged to continue mobility so avoid becoming stiff and sore and to apply ice and heat to the affected region. (Tr. 459). Mr. Nitso reported experiencing one to two seizures annually on his AEDs. (Tr. 457).

On September 10, 2020, Mr. Nitso contacted the Cleveland Clinic reporting he was out of medication. (Tr. 546). His last appointment had been in November 2019 and the pharmacy had no refills on file. (Tr. 546, 550).

On October 29, 2020, Mr. Nitso presented to the Cleveland Clinic for an annual visit and medication refills. (Tr. 552). In comparison to his last office visit on November 8, 2019, in which he reported multiple seizures per week, Mr. Nitso and his fiancé both reported his seizure frequency had greatly improved but the seizures had increased in intensity. (*Id.*). They reported the generalized tonic-clonic seizures were occurring once per month and lasting approximately 3-5 minutes each. (*Id.*). Mr. Nitso's fiancé stated they had become more intense with more violent shaking, and when he experiences a generalized tonic-clonic seizure, it takes him a full day to recover. (*Id.*). His smaller seizures were occurring once or twice every two weeks, which was an improvement from the multiple times per week he was experiencing in November 2019. (*Id.*). He endorsed losing chunks of time when the episodes occur, and his fiancé stated the smaller seizures last approximately one to five minutes and at times he can talk through them. (*Id.*). CNP Hannah Haseley reviewed discharge plans with Mr. Nitso and his fiancé, including activities Mr. Nitso

should avoid for his own safety, such as driving and swimming, as well as instructions to follow up in three months with Dr. Jehi. (Tr. 556). He was instructed to decrease his Zonisamide prescription while increasing another AED (Vimpat) over an eight-week period. (*Id.*).

## III. MEDICAL OPINIONS

State agency medical consultants reviewed Mr. Nitso's record at the initial and reconsideration levels. Andrea VanEstenberg, Ph.D., completed a consultative psychological examination on August 5, 2020. (Tr. 493-98). During the interview, Mr. Nitso described a history of depression, anxiety, and problems with his memory. (Tr. 495). Dr. VanEstenberg diagnosed Mr. Nitso with adjustment disorder with mixed anxiety and depressed mood. (Tr. 496).

On August 5, 2020, Dr. Lynne Torellol opined Mr. Nitso could perform work at all exertional levels but needed to avoid all work around heights, hazards, and commercial driving. (Tr. 85-86, 92-93). On September 8, 2020, Dr. Dimitri Teague adopted this opinion on reconsideration. (Tr. 99-101, 107-08).

## IV. OTHER RELEVANT EVIDENCE

Mr. Nitso completed an Adult Function Report dated July 2, 2020. (Tr. 253-60). He explained he has lost countless jobs due to seizures, which he has had while driving, working, eating, and sleeping. (Tr. 253). He noted his fiancé must watch him while bathing and using the toilet because he has fallen before in those settings from a seizure. (Tr. 254). He reported his medications and his seizures cause him to forget a lot of things and he often needs reminders to take his medications and take care of personal needs and grooming. (Tr. 255). He reported his fiancé prepares all food or meals because it is not safe to cook if he has a seizure. (*Id.*). The only

chore he consistently does by himself is mowing the lawn, during which time his fiancé "keeps an eye on [him]." (*Id.*).

Mr. Nitso's fiancé, Michelle Metz, completed a seizure questionnaire on July 3, 2020. (Tr. 261-62). She has been Mr. Nitso's fiancé for almost nine years and reported seeing Mr. Nitso have over 200 seizures of varying severities. (Tr. 261). Ms. Metz also completed a Third-Party Function Report on November 23, 2020. (Tr. 298-305). She largely corroborated Mr. Nitso's self-reported functioning, adding he struggles to follow instructions and often forgets to take care of their dog, take his medications, and is unable to handle stress, often experiencing anger issues. (*Id.*).

## V.   ADMINISTRATIVE HEARING

At the hearing before the ALJ, Mr. Nitso testified he lives with his fiancé and three children, ages eight, six, and five. (Tr. 37). His fiancé works for food delivery services such as Door Dash. (*Id.*). Mr. Nitso and his fiancé receive food stamps and health insurance through government benefits. (Tr. 37-38). Mr. Nitso's driver's license was suspended due to the seizures, so he does not drive. (Tr. 38). He received his GED around ten years ago. (*Id.*). Mr. Nitso occasionally does part-time work for his friend moving heavy things around his friend's house for around $40 or $50 per month. (*Id.*).

Mr. Nitso's work history includes working at Black Lion, a steel mill, through Randstad, a temporary agency, from July through October of 2019. (Tr. 41). Mr. Nitso left Black Lion due to his seizure in October of 2019. (*Id.*). He also completed random jobs for Specialty Strip and Oscillating, another steel mill, from 2013 through 2019, including running machines, running tow motors, laboring, and any other job that needed done in the shop. (*Id.*). He performed similar work at two other steel mills from 2008 through 2013. (Tr. 44).

Mr. Nitso explained the main reason he cannot work is his seizures. (Tr. 45). He testified every time he has a seizure, it puts him out of work for six months or longer. (*Id.*). He is scared it will cost him his life and his family "cannot afford that." (*Id.*). Mr. Nitso has lost three separate jobs because he has seizures at work. (*Id.*). At Specialty Strip, he had three or four grand mal seizures during work before "they just let [him] go" without giving him a reason. (Tr. 46).

Mr. Nitso explained after he suffered the seizure at work in October of 2019, he underwent a video EEG and other tests, but his medications were not changed. (Tr. 47). Then, shortly after, he visited a neurologist who changed his medications slightly. (*Id.*). The ALJ questioned why Mr. Nitso did not follow up after the neurology visit until October of 2020 at his annual check-up. (Tr. 47-48). Mr. Nitso stated he was waiting for a call from his doctor, and thought they were going to call him to set up an appointment. (Tr. 48). He was under the impression his doctors would figure out if his medication was changing anything. (*Id.*).

Mr. Nitso agreed he was having grand mal seizures every four to six months in October 2019. (*Id.*). He could not remember how often he had them after October of 2019 because his seizures cause him memory loss. (*Id.*). Often, he will have a seizure but believes he just fell asleep and does not know whether he had one. (Tr. 50). Because of this, his fiancé often monitors the number and keeps track of how many he has had. (*Id.*). In October of 2020, Mr. Nitso and his fiancé reported he had one grand mal seizure a month. (*Id.*). The ALJ questioned why, after experiencing such a marked increase in seizures, he would not follow up with his doctor before his annual visit. (Tr. 51). Mr. Nitso had no explanation for his lack of follow up. (*Id.*). At the time of the hearing, Mr. Nitso was on his seventh week of the eight-week transition to a new medication, and therefore was unable to state whether the change helped his seizures. (Tr. 51-52).

At the time of the hearing, Mr. Nitso's children were all completing school online due to the COVID-19 pandemic. (Tr. 53). He helps them log in to their laptops and do their schoolwork. (*Id.*). He makes sure they wake up in the morning and get ready for school, and he gets them snacks and lunch. (*Id.*). He can do household chores, vacuum, sweep, dishes, laundry, and prepare food for the most part. (Tr. 54). His fiancé does the shopping, but he could do it. (Tr. 55).

Although his daily activities were limited due to COVID-19, Mr. Nitso takes walks, visits his brother, watches TV, plays PlayStation with his children, lets them play in the snow, cleans up after them, and keeps the house clean. (Tr. 56-57). The day after a grand mal seizure, he sleeps all day. (Tr. 58). If he has a grand mal seizure while sitting on the couch, it will take about two days before he is able to be up. (*Id.*). Mr. Nitso did not know when he started having grand mal seizures once a month and explained his fiancé is the person who is in the best position to report the frequency. (Tr. 59).

VE Brett Salkin then testified.

**Hypothetical One.** VE Salkin assumed a hypothetical individual of Mr. Nitso's age and education with Mr. Nitso's work history who is subject to the following non-exertional limitations: he can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds. He must avoid all exposure to workplace hazards such as unprotected heights, moving mechanical parts, and commercial driving. He could perform simple, routine tasks, but not at a production rate pace, and not with strict production quotas. VE Salkin testified the individual could not perform any of Mr. Nitso's past work. (Tr. 61). The individual could, however, perform unskilled jobs such as cleaner (DOT 323.687-010), dishwasher (DOT 318.687-010), or grocery bagger (DOT 920.687-014). (*Id.*).

**Hypothetical Two.** VE Salkin then assumed the same limitation from Hypothetical One, but additionally included that the individual can perform light work as defined by Social Security regulations. (Tr. 61-62). VE Salkin testified while the individual could still not perform any of Mr. Nitso's former work, the person could perform unskilled jobs such as food service worker (DOT 311.677-010), cashier (DOT 211.462-010), or housekeeper (DOT 323.687-014). (Tr. 62).

The percentage of additional off-task time employers will tolerate for the above positions is no more than 10%. (*Id.*). To sustain competitive employment, a person in those positions can average no more than one absence per month. (Tr. 63).

Mr. Nitso's counsel then questioned VE Salkin on an employer's tolerance for frequency of grand mal seizures in the workplace. (*Id.*). The ALJ cautioned the question ranged too far outside the realm of specific vocational limitations. (Tr. 63-64). The ALJ and Mr. Nitso's counsel disagreed on the record regarding the appropriateness of the VE's testimony, which I address in detail below.

## VI. THE ALJ'S DECISION

The ALJ's decision, dated January 5, 2021, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant has not engaged in substantial gainful activity since October 17, 2019, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds. He must avoid all exposure to workplace hazards such as unprotected heights, moving mechanical parts, and commercial driving. He can perform simple routine tasks, but not at a production rate pace and not with strict production quotas.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February 9, 1988 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 17, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is

more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

11

2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available

12

work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past

work experience to determine if the claimant could perform other work. *Id.* Only if a claimant

satisfies each element of the analysis, including inability to do other work, and meets the duration

requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see*

*also Walters*, 127 F.3d at 529.

DISCUSSION

I.      **Any Constitutional defects in Andrew Saul's appointment as Commissioner of the Social**
        **Security Administration do not warrant remand in Mr. Nitso's case.**

Mr. Nitso argues the appointment of Andrew Saul as Commissioner of the Social Security

Administration (SSA) violated the separation of powers and the decision by an ALJ who derived

his authority from Commissioner Saul was constitutionally defective. (Pl.'s Br., ECF #7, PageID

586). The Commissioner agrees with Mr. Nitso that 42 U.S.C. § 902(a)(3)'s removal provision

"violates the separation of powers to the extent it is construed as limiting the President's authority

to remove the Commissioner without cause." (Comm'r's Br., ECF #10, PageID 615). But even so,

the Commissioner responds that Mr. Nitso's separation of powers argument does not entitle him

to a rehearing of his claim. (*Id.*).

Initially, I conclude Mr. Nitso has not forfeited his ability to present his constitutional

challenge even though he did not raise it at the administrative level. (See Pl.'s Br., ECF #7, PageID

595). In *Carr v. Saul*, 141 S. Ct. 1352 (2021), the Supreme Court held a claimant need not exhaust

a constitutional claim at the administrative level, but instead may present it for the first time at the

district court level. *Id.* at 1362. Even though Mr. Nitso clears this hurdle, he still is not entitled to

an order of remand based on this issue.

In *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), the Supreme Court found a statutory restriction on the President's ability to remove the head of an agency "only for inefficiency, neglect, or malfeasance" violates the separation of powers and is unconstitutional. *Id.* at 2197. The Court further found the offending clause was severable from the other portions of its Act, thereby maintaining Consumer Financial Protection Bureau intact as an agency. *Id.* at 2208, 2211.

Subsequently, in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), the Court considered the Federal Housing Finance Agency (FHFA) and its enabling statute, which contained a provision stating the head of FHFA was removable by the President "only 'for cause.'" *Id.* at 1770. The Court concluded such a provision violated the separation of powers and was unconstitutional. *Id.* Relying on *Seila Law*, the Court further explained the unconstitutionality of a removal provision does not strip an agency head of the authority to carry out the other functions of the office. *Collins*, 141 S.Ct. at 1788; *see also id.* at n.23 ("Settled precedent also confirms that the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . .") (citing *Seila Law*, 140 S.Ct. at 2207-11). Instead, to obtain remand, the plaintiff must demonstrate "compensable harm" flowing from the unconstitutional removal clause. *See Collins*, 141 S.Ct. at 1788-89. The absence of a nexus between the purported harm and the challenged removal restriction "defeats the . . . argument for setting aside" agency action. *Id.* at 1787.

Mr. Nitso makes various claims alleging he was harmed due to the unconstitutional removal provisions in § 902(a)(3). (Pl.'s Br., ECF #7, PageID 593). None are persuasive.

Initially, Mr. Nitso argues he was denied a valid administrative process because the ALJ's authority to make disability determinations was derived from a commissioner who was subject to

14

an unconstitutional removal provision. (*Id.*). But courts have routinely rejected similar defective

delegation arguments. *See, e.g., Cutlip v. Kijakazi*, No. 1:20-cv-00202, 2022 WL 812378, at *4–5

(W.D. Ky. Mar. 16, 2022) (rejecting argument that ALJ and Appeals Counsel Judges derived their

authority from the Commissioner who was not constitutionally appointed); *Lynch v. Comm'r of Soc.

Sec.*, No. 1:21-cv-00556, 2022 WL 614777, at *16 (N.D. Ohio Mar. 2, 2022) (finding no

compensable injury where claimant assert that ALJ who decided the case was under the delegated

authority of a Commissioner who lacked constitutionally valid legal authority to delegate); *Fauvie v.

Comm'r of Soc. Sec.*, 4:20-cv-2750, 2022 WL 2662866, at *4 (N.D. Ohio Jul. 11, 2022).

Mr. Nitso's allegations as to former Commissioner Saul's (and Acting Commissioner

Kijakazi's) inability to delegate authority to lesser officials in the SSA are unavailing. As in *Collins*,

the existence of an unconstitutional removal provision did not strip then-Commissioner Saul of

his authority to carry out the functions of his office, including the authority to delegate disability

determinations to ALJs and to implement changes to Agency regulations. As the Court noted in

*Collins*, "[a]lthough the statute unconstitutionally limited the President's authority to *remove* the

confirmed Directors, there was no constitutional defect in the statutorily prescribed method of

appointment to that office. As a result, there is no reason to regard any of the actions taken by

FHFA ... as void." 141 S. Ct. at 1787 (emphasis in original). The *Collins* Court further found

"there is no basis for concluding that any head of the FHFA lacked the authority to carry out the

functions of the office" because the removal restriction was unconstitutional. *Id.* at 1788

("unlawfulness of the removal provision does not strip the Director of the power to undertake the

other responsibilities of his office, including implementing the third amendment") (citing *Seila

Law*, 140 S. Ct. at 2207-11). Rather, "to obtain reversal of an agency decision, a plaintiff would

need to demonstrate compensable harm flowing from the unconstitutional removal clause." *Id.* at 1788-89.

Mr. Nitso asserts "Defendant ignored the injuries to Plaintiff in that in addition to the adverse decisions, [Mr. Nitso] did not receive the constitutionally valid adjudications process to which he was entitled." (Pl.'s Br., ECF #7, PageID 595). Mr. Nitso reasons that the notice terminating Mr. Saul noted he had undermined and politicized Social Security disability benefits. (*Id.*). Thus, Mr. Nitso believes it can be inferred that the policy adjudication framework and processes Commissioner Saul established was the primary and lead reason for President Biden's dissatisfaction. (*Id.*). In addition, Mr. Nitso infers President Biden believed Commissioner Saul had infringed on the constitutional due process rights of disability applicants. (*Id.*).

Although "the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment," it is still possible for an unconstitutional statutory provision to inflict compensable harm entitling claimants to retrospective relief. *Collins*, 141 S. Ct. at 1788-89. The Supreme Court offered examples of situations where unconstitutional removal restrictions could inflict compensable harm:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id.* at 1789. Notably, each example requires that the President specifically acknowledge being prevented from removing an agency head due to the unconstitutional statutory provision. Expressions of "displeasure" from the President, without more, do not demonstrate the type of compensable harm flowing from the removal provision contemplated by the *Collins* Court.

16

Mr. Nitso has not alleged the President "asserted that he would remove the [Commissioner] if the statute did not stand in the way." *Id.* Rather, Mr. Nitso makes generalized statements and allusions as to the President's displeasure but does not point to public statements by the President stating that but for the statute, he would remove the Commissioner. Therefore, any argument Mr. Nitso makes to show compensable harm flowing from President Biden's inability to remove former Commissioner Saul due to the unconstitutional removal provision fails.

Mr. Nitso does not present any evidence showing that but for the removal restriction, his claim would have been decided differently. Under *Collins*, he must show the "existence of [the removal restriction] alone tainted" the administrative decision. *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021). By contrast, the Appeals Council denied Mr. Nitso's request for review during the tenure of Kilolo Kijakazi, whom President Biden appointed to serve as the Acting Commissioner of Social Security, replacing Commissioner Saul.

As a result, I conclude Mr. Nitso has not shown that Acting Director Kijakazi, the Appeals Council, or the ALJ lacked authority to carry out the functions of their respective offices due to the constitutional defect in § 902(a)(3). *See Collins*, 141 S. Ct. at 1788 n.23 (noting that "unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office ...").

Mr. Nitso's constitutional arguments are without merit, and I therefore reject them.

## II.   The ALJ did not err in clarifying the VE's testimony regarding the impact seizures would have on workplace absences.

As a preliminary matter, I reject any argument that the ALJ "pressured" the VE into changing his testimony regarding an employer's tolerance for grand mal seizures in the workplace. At the hearing, Mr. Nitso's attorney, asked VE Salkin what an employer's tolerance for grand mal

seizures is in the workplace. (Tr. 63). VE Salkin testified such a question was not a performance

question, but rather an employability question. (*Id.*). He explained "for whatever it's worth . . . a

person who is an amputee, a person who has seizures, a person who has a visual impairment, who

poses a risk for themselves or someone else, is going to have difficulty sustaining employability."

(*Id.*). Mr. Nitso's attorney then asked at what point does a person who is having grand mal seizures

in the workplace become unemployable. (*Id.*). The ALJ interrupted with concerns that the line of

questioning was "too much outside of the realm of specific vocational limitations." (Tr. 63-64).

After some back and forth between the ALJ and Mr. Nitso's attorney, the ALJ then re-phrased the

question:

> Q:  So, Mr. Salkin, it sounds like the question is, how many grand mal Seizures
> will be tolerated in the work setting, by a specific employee? And if you want
> to limit it by a period of time, but also if that's not a question you can answer,
> then that's also an appropriate response.

> A:  I'm sorry, I'm having difficulty teasing out the vocational answer to the
> question on a performance basis. My opinion is it becomes an off-task
> question. I respect Mr. Liner's view about liability and other employability
> issues that could come up. But it's a difficult question to answer. **If a person
> has one seizure, they're probably not going to retain employment because
> anymore than one seizure becomes an accommodation by an employer
> that's contrary to competitive employment.** So, that's probably the best I
> can do with the vague metric of the question.

ATTY: Okay.

> Q:  So, and I—but I want to clarify that. So, are you saying that if a person ever
> has a seizure in the workplace, it's your opinion that they will become
> unemployable?

> A:  Well, I'm not saying it that strong. I'm saying that person would have a lot of
> difficulty maintaining employment related to task, there's a liability. And
> many employers do not offer accommodation for a variety of reasons. And
> again, these aren't job performance questions. These are employability
> questions that vary from employer to employer to some degree.

(Tr. 67-68) (emphasis added). On further questioning from the ALJ, VE Salkin then rephrased his

answer to put it in terms of the percentage of time an employee would be off-task:

Q:     And the problem is that we have to unwind because you have given some
       testimony that to me makes it confusing, what you're saying. And so, you
       know, you said things like it's a question of off task. And so, you know, I
       want to understand what the off-task issue is. If a person is off task for a single
       medical episode in the workplace, is that generally a basis for them to be
       terminated from their employment, if they're off task on a single day because
       of a medical incident?

A:     On an ongoing basis, if it's more than 10%, that person is not going to be
       able to maintain employment. Yes.

Q:     But I don't—but that's not an answer to the question.

A:     But not if the reach on that single episode of 10%, no.

Q:     Okay. So, a person has a single episode where they're off task, that doesn't
       meet your standards for when a person would be off task for purposes of
       losing their employment?

A:     I don't think we talk about a singular episode. We talk about an average of
       time.

Q:     Well, no but we didn't because you were offered the opportunity to talk about
       an average of time, and you said I think if they have a single seizure in the
       workplace, they're not going to be able to retain employment. Which doesn't
       seem consistent to me with what you said previously about off task. And that's
       why we're having to dig in further on this conversation because it looks like
       there's an inconsistency, and I want your testimony to be consistent. So, I
       need to dig in with you and find out what you mean.

       And so, if we have a single episode, and we don't—we're not going to
       call it a seizure, because of course this is—you know that's not—your job is not
       to make assessments based on medical conditions. But a person has a medical
       incident in the workplace, on a single occasion, from your—based on your
       experience as far as off-task behavior and absenteeism goes, is that going to
       preclude competitive employment?

A:     I'm sorry to be high maintenance, Your Honor. Because single incident, what
       kind of time are we talking about? You know, what kind—how does it affect
       performance is the question.

Q:      Okay. Well, so the person has a medical incident, and they have to leave work to go to the hospital. So, they have a medical incident and they leave work that day.

A:      More than once a month that person is not going to be able to retain employment.

Q:      All right. So, if a person had some sort of episode that causes them to leave work, and it happens more than one time per month, then that would restrict their ability to perform competitive employment? Is that fair to say?

A:      Maintain employment. Yes.

Q:      Okay. Okay. All right. And your testimony earlier about any disruption in the workflow requires an accommodation, were you talking there about a situation where a person is required to disrupt the workflow beyond what we're talking about here, the 10 percent and the one time per month?

A:      Yes.

(Tr. 73-76).

Mr. Nitso's attorney then argued that the ALJ had pressured VE Salkin into changing his answer because he first testified a person who has one seizure in the workplace would have difficulty keeping their job, but later he said a single medical incident would not prohibit a person from maintaining employment if it occurred less than once a month and the person was not having the medical incident for a long enough period of time such that it amounted to greater than 10% time off-task. (Tr. 76).

In her determination, the ALJ acknowledged the confusion:

The claimant's representative, Mr. Liner, stated that the undersigned's further attempts to clarify the vocational expert's testimony pressured the [sic] Mr. Salkin to change his testimony regarding employer tolerance for seizures in the workplace. Mr. Liner argued that seizures in the workplace would require an accommodation. The undersigned rejects Mr. Liner's characterization of the additional questioning of Mr. Salkin. Mr. Salkin stated initially that a person who had a grand mal seizure in the workplace would struggle to maintain employment, but he later stated that

20

employability was outside the scope of his testimony. Such statements were contradictory and the undersigned questioned Mr. Salkin further to resolve the inconsistency. There was no pressure on Mr. Salkin to change his testimony, only questioning to clarify inconsistent statements. Accordingly, the undersigned accepts Mr. Salkin's testimony that the issue was one of being off-task and absent as based on his education and professional experience.

(Tr. 23-24). In addition to the arguments made at hearing regarding the ALJ persuading the VE to change his testimony, Mr. Nitso argues the ALJ erred when she failed to find, based on the VE's testimony, that Mr. Nitso's seizures precluded him from engaging in substantial gainful activity on a full-time and sustained basis. (Pl.'s Br., ECF #7, PageID 600). The Commissioner does not provide much of a response to this argument, noting only "[t]he ALJ accurately discussed the vocational expert's testimony on this issue." (Comm'r's Br., ECF #10, PageID 635).

Having reviewed the transcript, I conclude the ALJ did not pressure the VE to change his testimony. Rather, she sought to clarify a response to his statements regarding an employer's tolerance for seizures in the workplace and whether the VE believed those statements were appropriately within the scope of his testimony. Originally, he testified if a person has one grand mal seizure in the workplace, the person requires an accommodation that inhibited competitive employment. Then VE Salkin re-framed his testimony in terms of percentage time off-task and number of absences incurred from the seizures themselves. The two contradict: either one seizure incident precludes all work or the seizures taken together preclude work if they cause the person to be off-task for more than 10% of the time or if they cause the person to incur more than one absence per month, on average. The ALJ properly identified the conflicting testimony and sought clarification, which the VE provided. Such a clarification is properly within the role of the ALJ as a factfinder.

I find the ALJ did not influence the testimony of the VE and reject Mr. Nitso's arguments to that effect.

### III. Any challenge to the ALJ's determination Mr. Nitso did not meet the Listing for epilepsy is waived for failure to provide more than a perfunctory argument.

According to Listing 11.02, epilepsy must be "documented by a detailed description of a typical seizure and characterized by A, B, C, or D." Characterizations B and D refer to a dyscognitive type of seizure[2] Mr. Nitso does not experience. Thus, he can only meet the listing through characterizations A or C with his generalized tonic-clonic seizures:

> A. Generalized tonic-clonic seizures[3] (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C).
>
> OR
>
> C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
> Physical functioning (see 11.00G3a); or
> Understanding, remembering, or applying information (see 11.00G3b(i)); or
> Interacting with others (see 11.00G3b(ii)); or
> Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
> Adapting or managing oneself (see 11.00G3b(iv)).

---

[2] For purposes of Listing 11.02, "[d]yscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur. During its course, a dyscognitive seizure may progress into a generalized tonic-clonic seizure." Listing 11.00H1b.

[3] For purposes of Listing 11.02, "[g]eneralized tonic-clonic seizures are characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions). Tongue biting and incontinence may occur during generalized tonic-clonic seizures, and injuries may result from falling." Listing 11.00H1a.

The ALJ determined Mr. Nitso did not meet the criteria of Listing 11.02 for epilepsy, stating "[i]n terms of [L]isting 11.02, the claimant reported one generalized tonic seizure per month, but there was no objective documentation of such frequency of seizures because the claimant did not seek regular treatment or have consistent neurological visits." (Tr. 18). In short, the ALJ found Mr. Nitso did not meet either Listing 11.02A or 11.02C because the record lacked objective documentation of the frequency of his seizures.

To raise a "substantial question" as to whether the claimant has satisfied a Listing, the claimant must do more than point to evidence on which the ALJ could have based his findings. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed. App'x 426, 432 (6th Cir. 2014) (citing *Sheeks v. Comm'r of Soc. Sec.*, 544 Fed. App'x 639, 641 (6th Cir. 2013). Rather, the claimant must point to specific evidence demonstrating he reasonably meets or equals every requirement of the Listing. *Id.*

An ALJ's explanation as to why a claimant does not meet the requirements of the listing is not required to be extensive. For example, the Sixth Circuit has found that even if the ALJ fails to sufficiently set out an explanation of her decision at Step Three, where the Listing required an "inability to ambulate" and the claimant "used one cane at most," any error was harmless because the claimant could not show that his impairment met or medically equaled the listing. *Forrest v. Comm'r of Soc. Sec.*, 591 Fed. App'x 359, 366 (6th Cir. 2014).

With respect to the Listing, Mr. Nitso argues although he had the burden at Step Three, "the ALJ had the obligation to conduct a full and fair inquiry into each claim and develop the record fully and fairly as to all components of the applicable Listings, including an evaluation of the evidence and an explained conclusion." (Pl.'s Br., ECF #7, PageID 596). "[T]he evidence in this matter supports the contention that the ALJ failed to properly consider the relevant evidence

and the fact that Nitso had the requisite number of seizures to satisfy the criteria of Listing 11.02. The ALJ filed to provide sufficient information so this Court can facilitate meaningful judicial review." (*Id.* at PageID 597). Mr. Nitso combines this argument with one regarding his RFC analysis at Step Four *and* the argument that the ALJ pressured the VE into changing his testimony, making it nearly impossible to determine what Mr. Nitso's Listing argument actually is. He simply concludes the ALJ failed to consider all the evidence in the matter and then summarizes the evidence he believes supports his meeting the Listing. (*Id.* at PageID 596-600).

"[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citing *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995) (citations omitted)).

I address whether substantial evidence supports the ALJ's determination of Mr. Nitso's RFC below. But to the extent Mr. Nitso also argues the same evidence supports his meeting the Listing, he provided only the skeleton of that argument, and I will not "put flesh on its bones" on Mr. Nitso's behalf. Given that the ALJ adequately explained her findings and considered the relevant evidence in evaluating whether Mr. Nitso met the Listing, I cannot reevaluate the decision here without more. Pursuant to *McPherson*, I deem this argument waived.

IV.     **The ALJ did not properly evaluate Mr. Nitso's symptoms.**

Mr. Nitso challenges the ALJ's findings regarding his RFC, which he believes did not account for the frequency of the seizures he experiences. The RFC involves analysis of subjective

24

reports from Mr. Nitso and his fiancé regarding the frequency of his seizures, evidence he claims was not properly analyzed under Social Security Ruling (SSR) 16-3p.

ALJs are to "consider all of the evidence in an individual's record" and determine whether the individual is disabled by examining "all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the individual's record." SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016). ALJs also evaluate what the agency formerly termed the "credibility" of a plaintiff's statements about his or her symptoms. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 246-49 (6th Cir. 2007). In March 2016, the agency eliminated its use of the term "credibility" and clarified "that subjective symptom evaluation is not an examination of an individual's character...." SSR 16-3p, 2016 WL 1119029, at *1 (rescinding and superseding SSR 96-7p). To avoid such mistaken emphasis, this analysis is now characterized as the "consistency" of a claimant's subjective description of symptoms with the record. *See Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 n.3 (6th Cir. 2020) (citing *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016)).

Symptom evaluation is a two-step inquiry. First, the ALJ determines if the record contains objective medical evidence of an underlying medically determinable impairment that could reasonably be expected to produce the individual's symptoms. SSR 16-3p, 2016 WL 1119029, at *3; *see also* 20 C.F.R. § 404.1529(a); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003). Second, the ALJ considers the intensity and persistence of the symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities. *See* 20 C.F.R. §§ 404.1529(a), (c); SSR16-3p, 2016 WL 1119029, at *4. In making this determination, the

ALJ considers the following: (i) the claimant's daily activities; (ii) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate their pain or other symptoms; (v) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (vi) any measures used to relieve pain or other symptoms; and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

An ALJ may not consider only objective medical evidence in determining disability unless this evidence alone supports a finding of disability. SSR 16-3p, 2016 WL 1119029, at *5. The regulations at 20 C.F.R. § 404.1529 outline an ALJ's analysis with respect to objective medical evidence as follows:

> *Consideration of objective medical evidence.* Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption. Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work. We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. **However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.**

20 C.F.R. § 404.1529(c)(2) (emphasis added).

It is not enough for an ALJ "simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator

evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029, at *9; *see also id.* at *7

(noting that the ALJ "will discuss the factors pertinent to the evidence of record").

In discounting Mr. Nitso's and Ms. Metz's subjective accounts, The ALJ stated as follows:

> He and his fiancé indicated frequent seizures, but aside from periodic exams, there was little indication of the frequency of seizures that he described. Indeed, there was no diary of seizures and the claimant sought limited medical treatment and thus there was little to confirm the frequency and severity of seizures that the claimant and his fiancé described.

(Tr. 22).

The ALJ discredited Mr. Nitso and Ms. Metz's descriptions of the frequency and severity of the seizures because there was no diary of seizures and Mr. Nitso sought limited medical treatment. (Tr. 22). Both a seizure diary and additional in-hospital observation of Mr. Nitso's seizures would have further substantiated the claims of frequency. But identifying objective medical evidence missing from the record that would bolster their subjective symptom reporting does not explain why their account of the frequency of seizures was not credible based on the objective evidence within the record. The ALJ did not identify what objective evidence in the record discredits their accounts of the frequency of Mr. Nitso's seizures. Additionally, the ALJ did not specify how many seizures she believed Mr. Nitso experiences per month based on the evidence in the record. Without such, I can only conclude the ALJ's determination is not supported by substantial evidence.

The ALJ's determination that Mr. Nitso's subjective account of the frequency of his seizures included specific reasons for the weight given to the individual's symptoms as required by SSR 16-3p. But SSR 16-3p also requires the determination be consistent with and supported by

the evidence and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

Seizures in particular are tricky in this context. They often occur sporadically. While a patient may be diagnosed with epilepsy, be prescribed medication, and even be observed to experience seizures by a medical professional, most seizures likely occur outside the hospital, because that is where most persons spend the bulk of their time. This makes it difficult to substantiate with objective medical evidence a claimant's subjective account of the frequency of their seizures, creating a greater need for explanation as to why the ALJ found Mr. Nitso's and Ms. Meltz's accounts inconsistent with record evidence.

The ALJ's explanation does not cite any record medical evidence or explain how she weighed that evidence. Instead, the ALJ stated: "[i]ndeed, there was no diary of seizures and the claimant sought limited medical treatment and thus there was little to confirm the frequency and severity of seizures that the claimant and his fiancé described." (Tr. 22). This explanation does not satisfy the regulatory requirement that an ALJ may not reject a claimant's statements about the intensity and persistence of pain or other symptoms because the available objective medical evidence does not substantiate the claimant's statements. 20 C.F.R. § 404.1529(c)(2).

Additionally, the ALJ did not explain how she considered all the present factors outlined in 20 C.F.R. § 404.1529(c)(3). For example, in determining that Mr. Nitso's seizures happened less frequently than he and Ms. Metz reported, the ALJ did not explicitly consider his daily activities. While Mr. Nitso can do household chores, vacuum, sweep, dishes, laundry, and prepare food "for the most part" (Tr. 54), it appears he is severely limited or requires supervision with certain tasks

because it would be dangerous if he has a seizure while doing them, such as bathing (Tr. 254),

cooking on the stove (Tr. 255), and mowing the lawn (*Id.*).

Although she noted that Mr. Nitso "sought limited medical treatment," the ALJ did not

explain what treatment should have been sought or build a logical bridge between Mr. Nitso's

treatment and his account of the frequency of seizures he experiences. *See* 20 C.F.R.

§ 404.1529(c)(3). Additionally, she did not explain why Mr. Nitso's limited medical treatment

supports discounting his numerous, consistent statements to medical providers, as well as the

statements of Ms. Metz, that he suffers at least one generalized tonic clonic seizure a month. Even

more, in her determination, the ALJ noted that in October of 2020, Mr. Nitso "said he had

multiple seizures per week and frequency of the seizures had increased greatly[,]" citing encounter

notes from a doctor visit on October 29, 2020. (Tr. 21). The record, however, indicates that Mr.

Nitso made those statements at his LOV (last office visit), which was on November 8, 2019. (Tr.

552). Instead, at the encounter in October of 2020, Mr. Nitso explained that the seizure frequency

was improved – although still occurring once a month – but that the shaking had become more

violent. (*Id.*). This may be an important clarification because it could explain why Mr. Nitso

"sought limited medical treatment" as the ALJ reports. In other words, because his seizures had

improved somewhat, he may not have thought it necessary to seek additional treatment between

November 2019 and October 2020, contrary to the ALJ's conclusion that limited medical

treatment discounts his claimed frequency of seizures.

The ALJ also did not consider the type, dosage, effectiveness, and side effects of any

medication Mr. Nitso takes or has taken to alleviate their pain or other symptoms, as required by

20 C.F.R. § 404.1529(c)(3). The alleged onset date involved a "breakthrough" seizure, meaning

that although Mr. Nitso's seizures were generally under control, one "broke through" unexpectedly. (*See* Tr. 315).[4] Accordingly, it appears his AEDs were changed multiple times during the relevant period in an attempt to control his seizures. (Tr. 47, 313, 556). Additionally, the record indicates Mr. Nitso experiences memory loss from both his seizures and as a side effect of his medications (Tr. 255), a fact not mentioned in the ALJ's decision.

Contrast this with the objective medical evidence cited in *Brant v. Comm'r of Soc. Sec.*, 33 Fed. App'x 795 (6th Cir 2002). In *Brant*, the ALJ expressly found a claimant's account of the frequency and intensity of her seizures not credible when balanced against the lack of hospital or emergency room visits; the absence of any first-hand corroboration by medical personnel; the claimant's own accounts of her many, varied daily activities despite the side effects of her medication; the evidence of the sub-therapeutic level of medication; and a medical opinion the claimant would be "seizure free" with proper medication. *Id.* at 797. Based on this, the Sixth Circuit affirmed the District Court's finding that the ALJ's decision was supported by substantial evidence.

The ALJ in this case did not cite any medical evidence in the record contradicting the claims of Mr. Nitso and Ms. Metz regarding the frequency of his seizures. She did not explain the frequency of seizures based on the evidence actually contained in the record. Without knowing how many seizures the ALJ determines Mr. Nitso experiences per month, I am unable to determine if the ALJ's conclusion regarding Mr. Nitso's RFC is supported by substantial evidence.

---

[4]     Mr. Nitso's presentation on October 17, 2019, included the following clinical note: "[t]his is a 31 year old right handed male who presents with a chief complaint of breakthrough seizures. Seizure onset was about 7-8 years ago. The Patient's typical seizure frequency is 1 every 2-3 months. However, he had seizures on 10/6/2019, 10/15/2019, and two seizures this morning (10/17/2019)." (Tr. 315).

VE Salkin's assumed hypothetical involved an individual of Mr. Nitso's age and education with Mr. Nitso's work history that is subject to the following non-exertional limitations: he can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds; he must avoid all exposure to workplace hazards such as unprotected heights, moving mechanical parts, and commercial driving; and he could perform simple, routine tasks, but not at a production rate pace, and not with strict production quotas. (Tr. 60-61). The second hypothetical was identical but assumed the individual could perform light work. (Tr. 61). Neither hypothetical accounted for the number of seizures the individual would experience monthly.

The number of seizures the ALJ believes Mr. Nitso experiences monthly is important to include in his RFC because his ability to engage in substantial gainful activity is partially based on the number of absences he will likely incur due to seizures and recovery time. VE Salkin testified "a person can incur on average, or [on an] ongoing basis, no more than one absence a month to sustain competitive employment." (Tr. 63). For example, if the ALJ determines the record supports a finding Mr. Nitso experiences one grand mal seizure every five weeks, if he must leave work unexpectedly after a seizure and take the next day off of work to recover once every five weeks, he may incur more than one absence per month, which VE Salkin testified would be work preclusive. (Tr. 63). Thus, the hypotheticals need to account for the number of seizures the ALJ believes Mr. Nitso experiences.

In a similar case out of the Northern District of Illinois, the ALJ noted the VE's testimony recurring seizures on a weekly basis or several times each month would eliminate all competitive work. *Donte A. R. v. Saul*, No. 19 C 2363, 2020 WL 7241066 at *3 (N.D. Ill. Dec. 9, 2020). But the ALJ concluded that "the record as a whole does not support that claimant would have seizures at

the frequency outlined in the representative's hypothetical." *Id.* "Thus, the ALJ rejected [the claimant's] testimony regarding the alleged frequency of seizures, but she did not address the precise frequency of seizures in developing the RFC or in the hypothetical posed [to] the VE." *Id.* The district court found that because consideration of "all relevant evidence concerning the frequency of Donte's seizures is critical in determining his RFC, remand is required for the ALJ to more thoroughly discuss and evaluate..." *Id.* at *6.

Here, the ALJ did not include in the proposed hypotheticals the number of absences, if any, a person who experienced recurring seizures might incur. Based on VE Salkin's testimony on average more than one absence a month would be work preclusive, such an inquiry seems not only relevant but potentially determinative of whether such an individual can engage in substantial gainful activity.

In the absence of the ALJ addressing the frequency of seizures in developing the RFC or hypotheticals posed to the VE, I am unable to conclude the ALJ's RFC is supported by substantial evidence. Therefore, the Commissioner's decision must be reversed, and the matter remanded for proceedings consistent with this opinion.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I

**REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental

security income and **REMAND** this matter to the Commissioner for further proceedings

consistent with this opinion.

Dated: January 20, 2023

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE